Argued September 8, 1954, reversed and remanded January 26, 1955, petition for rehearing denied February 23, 1955

# COOS BAY LUMBER COMPANY *v.* LOCAL 7-116, INTERNATIONAL WOODWORKERS OF AMERICA, COUTY

279 P. 2d 508
280 P. 2d 412

344

*James P. Rogers,* Portland, argued the cause for plaintiff-respondent. With him on the brief were Hart, Spencer, McColloch, Rockwood & Davies, Portland.

*William A. Babcock,* Portland, argued the cause for defendants-appellants. With him on the brief was Clarence J. Young, Portland.

A. L. Couty, Coos Bay, pro se.

Before LATOURETTE, C.J.*, and WARNER**, ROSSMAN, LUSK, BRAND and PERRY, Justices.

## ROSSMAN, J.

This is an appeal by three of the 92 defendants from a declaratory judgment and decree which was entered by the circuit court at the conclusion of its trial of this cause. The three appealing defendants are Shirley Johnston, Howard Campbell and Local 7-116, International Woodworkers of America (CIO).

The plaintiff-respondent, Coos Bay Lumber Company, is a Delaware corporation which has complied

---

\* Chief Justice when this case was argued.
\*\* Chief Justice when this decision was rendered.

with the laws of this state governing foreign corporations and which operates manufacturing plants in this state. It is engaged in "commerce" as that term is defined in the Labor Management Relations Act, 61 Stat 136, 29 USCA, § 152(6). The defendant-appellant, Local 7-116, International Woodworkers of America (CIO), to which we will hereafter refer as the union, is a labor organization as that term is employed in the Labor Management Relations Act, 29 USCA, § 152(5). It is the bargaining representative of the employees of the plaintiff-respondent, Coos Bay Lumber Company, to which we will hereafter refer as the employer or the plaintiff. The defendants-appellants, Shirley Johnston and Howard Campbell, are, respectively, the president and the business agent of the union. The 89 other defendants are, or were, employees of the plaintiff. None of them, with the exception of A. L. Couty, has appeared in this court. Mr. Couty, in propria persona, filed a short brief with this court which favors the challenged decree.

The relief sought by the complaint was the interpretation of a provision of the collective bargaining agreement which was in effect between the employer and the union. The agreement bore the signatures of the employer and the union. It did not contemplate that the employees should sign it, and none of them had signed it. The complaint petitioned the court to determine whether the collective bargaining agreement required the employer to make deductions from the wages of its 89 employees above mentioned, against their protest, and pay the deducted amounts, as directed by the union and the agreement to finance an employees' insurance program, or whether the collective bargaining agreement permitted the employer to pay the disputed wage

amounts to those of its workmen who had notified it that they did not want the employees' insurance, but wished to have the entire amount of their wages paid to them. The union, by cross complaint, asked for (1) an accounting of all sums of money which had not been paid by the employer to the insurance carrier, (2) specific performance of the collective bargaining agreement, and (3) "such other relief as to the Court may seem just and equitable."

The challenged judgment and decree sustained the position of the employer and of the 89 employees who had dissented from the collective bargaining agreement. The trial court ruled that neither federal nor state law authorized the union, through collective bargaining, to commit the wages of the employees whom it represented to the financing of an employee insurance program.

Prior to 1950 the employer and the union had signed collective bargaining agreements which governed the relationship between the employer and those of its workmen who worked in its plants. June 20, 1950, after a period of negotiation, the employer and the union amended their collective bargaining agreement by inserting in it these provisions:

"1. All employees covered by this agreement shall receive a wage increase of 7½ cents per hour effective May 1, 1950 and the wage scale shall be revised accordingly.

"2. There shall be included in each working agreement where there is no existing employer benefit plan in effect between the Local Union and Employer, the following clause:

" 'Upon execution of this agreement in his behalf by Union, and so far as is consistent with law, each employee covered by this agreement authorizes

and directs Employer to deduct from his earnings each month the sum of not more than 7½ cents for each hour worked by him and pay said sum to such insurance carrier or carriers as the Union or its authorized representative may designate for employee social benefits. Such sum shall be paid on the statement of the insurance carrier or carriers so designated. Employer will cooperate with the Union and the insurance carriers in securing necessary information for coverage.'

"3. Where an employee benefit program is now in effect in an operation, Employer shall receive credit for his contribution to such program, and said program may be supplemented to the extent set forth in the above.

\* \* \* \* \*

"5. Employee social benefit issues shall be closed until April 1, 1952."

The provisions just quoted are the parts of the collective bargaining agreement with which this suit is concerned. The parties refer to them as a Health and Welfare Insurance Program. The complaint prayed the court to construe them.

Prior to June 29, 1950, the union had arranged with the John Hancock Mutual Life Insurance Company (hereafter referred to as the insurance company) to issue to the plaintiff's employees policies of (1) life, (2) health and accident, and (3) accidental death and dismemberment insurance. The effective date of the insurance was July 1, 1950. At that time there was in effect a policy written by the Coos Bay Hospital Association which provided the employees with medical and hospital service. June 29, 1950, the union, through written notice, directed the employer to make deductions in the amount of 7½ cents per hour from each employee's wages and pay the total to the insurance company at its Portland office, less $3.50 per

month per employee for remittance to the Coos Bay Hospital Association. The letter directed the employer to make the deductions as of May 1, 1950. It requested that no deductions be made from the wages of employees whose employment terminated prior to July 1, 1950, since, obviously, those employees could obtain no benefits from the insurance.

The employer made no deductions for payment to the insurance company from the wages of any of its workmen for the period of May 1, 1950, to July 1, 1950, but instead paid to them the sum of $11,706.97 which would otherwise have been deducted and paid to the insurance company. In short, in the period of May 1, 1950, to July 1, 1950, the employer paid nothing to the insurance company. However, for that period the employer made the required deduction of $3.50 per month per employee for payment to the Coos Bay Hospital Association for those of its employees who, prior to June 21, 1950, had individually authorized the deductions and payments.

The record does not indicate the exact amount which the employer refused to deduct from its workmen and pay to the hospital association for the period extending from May 1, 1950, to July 1, 1950, for those who had not individually authorized the deduction and remittance.

From July 1, 1950, to August 1, 1950, the employer followed the instructions that it previously had received from the union as to those of its employees who had made no objection to the deductions. However, in that period the employer, contrary to the union's instructions, complied with the demands of those of its employees who had notified it to make no deductions for remittance to the insurance company. In lieu of

making the deductions from the wages of those dissenting employees, the company paid to the dissidents the amount which it otherwise would have included in the total which, month by month, it remitted to the insurance company. In the meantime, it paid to the Coos Bay Hospital Association the sums which its workmen individually authorized it to deduct from their wages for remittance to that association. The amount which the insurance company did not receive in the period of July 1, 1950, to August 1, 1951, on account of the omission of the company to make the deductions directed by the union was $6,020.51. The record does not indicate the amount, if any, which was diverted in that period from the hospital association for the medical and hospital insurance which it provided.

Since August 1, 1950, the employer has deducted from its workmen's wages and deposited in a special account the wage payments in issue pending the decision of this case, except for the amounts which it has continued to pay to the Coos Bay Hospital Association. Neither the amount, if any, which was diverted from the hospital association since August 1, 1951, nor the amount of the remittances to that association from August 15, 1951, appears in the record. The payments since August 15, 1951, were contrary to the instructions of the union, which on that day orally notified the employer to send all wage deductions permitted by the collective bargaining agreement to the insurance company.

As we have stated, the trial court upheld the employer's disposition of the disputed wage deductions and payments. It rendered a decree based on a belief that neither federal nor state law authorized the union, through collective bargaining, to commit the wages

of the employees which it represented to the financing of employee group insurance program.

The briefs of the employer and of the union devote much space to discussion of the question whether the collective bargaining agreement provides for an employer-paid or an employee-paid group insurance program. The plaintiff concedes that the plan which was inaugurated July 1, 1950, including its requirement for involuntary deductions, would be valid and would bind all of its employees if it (the employer) paid for the insurance. Its position appears to be that if the collective bargaining agreement had not spoken of a wage increase which financed the payment of the insurance, and if it (the collective bargaining agreement) had required the employer to purchase the group insurance, all of the employees would be bound by the provisions of the agreement, which is quoted in a preceding paragraph. Continuing, the employer argues that decisions cited by the union, in support of its contention that all of the employees were bound by the terms of the collective bargaining agreement, are authority only for employer-paid group insurance programs. It contends that because the plan in issue is not cast in such form it is, as to the dissidents, unauthorized to make deductions from their wages for remittance to the insurers. The employer cites sections of the Labor Management Relations Act of 1947 and also ORS 652.120. The latter requires employers such as the plaintiff to establish regular paydays "at which date all employees shall be paid the wages due and owing to them." Although the plan before us can properly be termed an employee-paid plan, we do not accept as substantial the distinction which the employer draws.

Sections 8(a)(5) and 9(a) of the Labor Management Relations act, 1947, (61 Stat 136) (29 USCA,

pocket part, § 141 et seq.), which are substantially the same as their corresponding provisions in the National Labor Relations Act of 1935 (49 Stat 449) read, respectively, as follows:

"Sec. 8. (a) It shall be an unfair labor practice for an employer—* * * (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9 (a)."

"Sec. 9 (a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purpose of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: *Provided,* That any individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect: * * *."

The employer concedes that *W. W. Cross & Co. v. National Labor Relations Board,* 174 F2d 875, *Inland Steel Co. v. National Labor Relations Board,* 170 F2d 247, and *Potlatch Forests, Inc. v. International Woodworkers of America,* 108 F Supp 906 (affirmed in *Olsen v. Potlatch Forests, Inc.,* 200 F2d 700) hold that group insurance programs which are employer paid are valid and bind all employees. The W. W. Cross decision required the employer to bargain with the union concerning a group life and accident insurance plan which the employer tried to establish unilaterally. The plan was to be financed partly by contributions of employees and apparently was to have been optional on their part. The Inland Steel decision held that the

employer must bargain with the union concerning a compulsory retirement provision of an employer-sponsored contributory plan, which, however, did not require participating employees to contribute. Both decisions held that such plans were included within the meaning of the terms "wages" and "other conditions of employment" as used in § 9(a) of the Labor Management Relations Act and the corresponding section of the National Labor Relations Act. The Potlatch decision upheld a group insurance program which was financed by a wage increase and corresponding deductions similar to the plan before us. There, the collective bargaining agreement, unlike the one in the present case, referred to the insurance program as a company-paid health and welfare program and provided that no employee should have any right to the wage increase except in the form of insurance benefits. However, the provisions to which we have just made reference do not appear in the report of that decision. They became known to us only through information supplied by the parties in this case. The reasoning in the Potlatch case, which is in accord with that employed in the Inland Steel case, was that group insurance programs are included within the term "conditions of employment" which that item of legislation deems a mandatory subject for collective bargaining.

Although in the cases just reviewed no distinction arose between employer-paid and employee-paid insurance programs, the Potlatch and Inland Steel decisions plainly decided that the term "wages" as used in the Labor Management Relations Act embraces what, for convenience, may be referred to as employer-paid plans. Since such plans are mandatory subjects for collective bargaining, a union has authority to obtain a wage increase for its members in the form of an employer-

paid insurance plan. It follows, therefore, that it also has the power to obtain a wage increase to be applied for the purchase of insurance as the union directs. Both situations involve substantially the same thing: a wage increase which takes the form of group insurance. As compared with the situation where a collective bargaining agreement provides for a so-called employer-paid plan, a contract between an employer and a union, such as the one before us, only indicates more specifically what such a group insurance plan really is when it provides that it is to be financed by a wage increase. Therefore, the distinction between employer-paid and employee-paid plans is at best one of form, not of substance, and the rights of the parties are the same in the two situations. *International Woodworkers v. McCloud River Lumber Co.*, 119 F Supp 475, in interpreting the provisions of a health and welfare insurance program substantially the same as the one before us, said:

> "To this Court, the difference between 'a wage increase intended as the method of financing the health and welfare plan' and 'a wage increase to pay for a Health and Welfare Program for the employees' seems like the difference between tweedledum and tweedledee!"

Incidental to the employer's distinction between employer-paid and employee-paid insurance programs is its argument that the Labor Management Relations Act of 1947 denies unions the power to require deductions from the wages of their members without the consent of the latter. This is supposedly borne out by § 302 of the Labor Management Relations Act of 1947 which imposes restrictions upon the check-off of union dues. The employer asserts that § 302 withdrew from the unions the privilege accorded them by the

previous law whereby they could authorize an involuntary deduction from the wages of their members. A check-off clause is different from the arrangement for wage deductions in this case. *Hughes Tool Co. v. National Labor Relations Board,* 147 F2d 69, held that check-off provisions are not mandatory subjects for collective bargaining. As that case indicates, the check-off is primarily for the benefit of the union touching its own business with its members. A group insurance program is primarily for the benefit of the members of the union. The provisions in the Labor Management Relations Act concerning check-off are found in a section which restricts payments by an employer to a union. This section does not purport to prohibit wage deductions for employee-group insurance and does not support the position of the company in this case.

The company, in pursuing its argument that a union may not arbitrarily deprive its members of rights which it gains for them through collective bargaining, cites: *Allen v. Southern Pacific Co.,* 166 Or 290, 110 P2d 933; *Shelley v. Portland Tug & Barge Co.,* 158 Or 377, 76 P2d 477; *National Labor Relations Board v. Union Pacific Stages,* 99 F2d 153; *Leeder v. Cities Service Oil Co.,* 199 Okla 618, 189 P2d 189. We do not believe that a decision sustaining the validity of the challenged provision of the collective bargaining agreement, which permits wage deductions for the financing of the insurance program in an amount no greater than the wage increase, secured by the same collective bargaining agreement, enables the union to give away the dissenting employees' wages or arbitrarily deprive them of the benefit of the employment contract. When the employer is required to make the wage deductions for the group insurance, every employee who is subject

to the collective bargaining agreement will receive what it and his employment contract contemplates.

The Labor Management Relations Act, according to our belief, authorizes an employer and a union to agree for the financing of a program of group insurance through a wage increase and corresponding deductions. However, the company asserts that as to dissenting employees it is prevented from making wage deductions for the purpose just mentioned by ORS 652.120, which provides:

"(1) Every person owning or operating any * * * sawmill, logging concern, * * * or the manufacturing, * * * coming under ORS 652.110, shall establish and maintain a regular pay day, notice of which shall be posted in a conspicuous place, at which date all employes shall be paid the wages due and owing to them.

"(2) Pay day shall not extend beyond a period of 30 days from the time that such employes entered upon their work, or from the date of the last regular pay day.

"(3) This section does not prevent the employer from establishing and maintaining pay days at more frequent intervals.

"(4) This section does not prevent any person engaged in any pursuit from entering into an agreement, mutually satisfactory, with his employes, as to the payment of wages at a future date."

In support of its position, the company cites *Chabot v. Prudential Insurance Company of America,* 77 RI 396, 75 A2d 317, and *Shine v. John Hancock Mutual Life Insurance Co.,* 76 RI 71, 68 A2d 379, 69 A2d 530. Those decisions held that a check-off provision in a collective bargaining agreement was invalid because it was unauthorized by the Rhode Island weekly payday statute which, unlike the Oregon statute, prohibited waiver of its provisions by private agreement. Since

the Rhode Island and the Oregon statutes differ in this respect, these two decisions do not support the position of the company.

We are aware of no decision which construes the above-quoted Oregon statute. The latter was enacted in 1925 (Oregon Laws 1925, p 460) before the advent of the federal legislation above cited. One purpose of such statutes is to prevent infrequent payroll distributions and to minimize the danger that employees may not receive all wages due them in the event of the employer's bankruptcy. See note, 63 Harvard Law Review 902. As we consider the plaintiff's above-mentioned contention, we notice that the Oregon wage statute does not by its terms limit the right of employees to select a bargaining representative to bargain in their behalf with respect to wages, hours or working conditions. Nor does it attempt to restrict the authority of the union to obtain uniform contracts of employment for those whom it represents. Rather, it requires employers to pay their employees periodically the wages which are due under their contracts of employment. For those reasons we reject the construction of the statute proposed by the employer, which is that the words "wages due and owing" should be construed to prevent the wage deductions in issue unless the employee individually authorizes them.

If we construe the wage statute as the plaintiff proposes, it will conflict, as we shall presently show, with a construction which has been given to §§ 8(b)(c) and 9(a) of the Labor Management Relations Act (29 USCA, pocket part, §§ 158 and 159). Most of the cases which resolve conflicts between state and federal labor legislation do not touch upon the precise point which the employer wishes this case to present, i.e. whether state or federal law prevails if the enactments appear

to conflict with each other as to the authorization required for wage deductions to finance group insurance programs. It has been held that state labor boards are without jurisdiction to certify bargaining units under state labor legislation where such units are within the jurisdiction of the National Labor Relations Board. *Bethlehem Steel Co. v. New York State Labor Relations Board,* 330 US 767, 91 L ed 1234, 67 S Ct 1026; *International Brotherhood of Electrical Workers (CIO) v. Wisconsin Employment Labor Relations Board,* 336 US 18, 93 L ed 463, 69 S Ct 379. As indicated in *Algoma Plywood & Veneer Co. v. Wisconsin Employment Relations Board,* 336 US 301, 93 L ed 691, 69 S Ct 584, § 10(a) of the Labor Management Relations Act was intended to ameliorate the effect of those decisions by providing that in proper cases the National Labor Relations Board can, by agreement, cede its jurisdiction to state or territorial agencies. *Hill v. Florida,* 325 US 538, 89 L ed 1782, 65 S Ct 1373, decided that a state cannot enjoin a labor union, unless the latter first obtains a license from a state agency, from representing its members. However, these cases related to the issue of certification of labor unions. *Shine v. John Hancock Mutual Life Insurance Company,* supra, and *Chabot v. Prudential Insurance Company of America,* supra, held that the Rhode Island weekly pay statute invalidated an involuntary check-off clause of a collective bargaining agreement. Since these cases turn on the proposition that check-off is not a mandatory subject for collective bargaining (*National Labor Relations Board v. Hughes Tool Co.,* supra,) they are inapposite to the issues of this case.

*International Union of Automobile Workers (CIO) v. O'Brien,* 339 US 454, 94 L ed 978, 70 S Ct 781, held that Michigan labor legislation, prescribing procedures

to be followed before a union could strike, was inconsistent with similar provisions of the Labor Management Relations Act. *Algoma Plywood & Veneer Co. v. Wisconsin Employment Relations Board,* supra, decided that state legislation concerning union security provisions, such as union shop and maintenance of membership clauses, was permissible because the legislative history of § 8(3) of the National Labor Relations Act (29 USCA, § 158) revealed that legislation concerning such union security provisions was left open to the states. Section 14(b) of the Labor Management Relations Act (29 USCA, pocket supplement, § 163(b)) is even more explicit on this point.

■ Returning to the specific issue of the case at bar, we believe that §§ 8(a)(5) and 9(a) of the Labor Management Relations Act clearly forbid state legislation which would in effect prohibit employee-group insurance plans of the kind before us unless each employee individually authorized the incidental wage deductions. As previously indicated, employee-group insurance programs are mandatory subjects for collective bargaining inasmuch as § 8(a)(5) of the Labor Management Relations Act requires an employer to bargain with a union concerning the matters set forth in § 9(a) of the act. Furthermore, the section just cited also provides that the selected bargaining representative shall be the exclusive representative of all employees in the bargaining unit. Since we have previously shown that there is no substantial difference between an employer-paid and an employee-paid group insurance program, the plan in the case before us is authorized by the federal statute. It seems clear that if a state statute were enacted providing that no labor union shall effect a change in wage rates for its members unless it obtained the individual authorization of each union

member, such a statute would be contrary to the provisions of the Labor Management Relations Act, and therefore invalid. The same would be true if a state statute were construed to require individual authorization for obtaining and financing group insurance programs through a wage increase followed by coresponding deductions. In either case such state legislation would not only prohibit employer-union negotiations as to matters which federal law in proper cases entrusts to collective bargaining, but would also have the effect of permitting each individual employee to be his own bargaining representative as to matters which federal law has declared to be within the exclusive authority of the bargaining representative. There is not present in the case before us any vital state policy, such as evasion of the state industrial safety laws, which it might properly be said that federal labor legislation left unaffected. Therefore, we are of the opinion that if the Oregon monthly-pay statute were construed to prohibit the wage deductions in issue, it would have to yield to the explicit purposes and policy of the Labor Management Relations Act.

For the reasons above stated, we believe we are not bound to follow the only federal decision which we have been able to find which ruled directly upon the issue presented by this phase of the case: *International Woodworkers of America Local 6-64 CIO v. McCloud River Lumber Co.*, 119 F Supp 475. That decision was left unmentioned by the parties to this case. Its facts were very similar to those in the case before us. The collective bargaining agreement in that case, with its sequel of an employee insurance program, was preceded by the same negotiations which we have mentioned; in fact, the decision discloses at length the negotiations. In that case, unlike the case at bar, the

collective bargaining agreement obligated the union to obtain the written authorization of each member of the union for the needed wage deductions to finance the insurance program. The union in that case contended that that provision was an independent covenant or that, in the alternative, it should be disregarded because inserted in the agreement under a mistaken impression that it was required by a California statute which governed wage deductions. The court held that the California statute was not overridden by federal labor legislation and required this provision as a condition precedent to the wage deductions. Therefore, it concluded that the parties labored under no mistake of law when they executed their agreement. However, that decision was based on some broad language concerning the Labor Management Relations Act which is contained in *National Labor Relations Board v. American National Insurance Co.*, 343 US 395, 96 L ed 1027, 72 S Ct 824, to the effect that the act does not regulate substantive terms governing wages, hours and working conditions which are incorporated in a collective bargaining agreement, and that the National Labor Relations Board may not compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements. Those statements are appropriate when taken in context with the holding of the American National Insurance Company case, which was that it was not an unfair labor practice for an employer to insist upon a management-functions clause in response to a union's proposal for unlimited arbitration as to matters which the employer wished to be solely within its discretion. Since the McCloud case apparently did not consider matters which we think would resolve any conflict between federal and state law in this case, on the authority of §§ 8(a)(5) and

9(a) of the Labor Management Relations Act and the W. W. Cross, Inland Steel and Potlatch cases, supra, we believe that the McCloud case was erroneously decided.

We conclude that our wage law, ORS 652.120, lends no support to the employer's contentions.

The employer also contends that the collective bargaining agreement did not require it to make deductions from wages and pay the sums thereby obtained to the insurance company for the period from May 1, 1950, to July 1, 1950. We think that paragraph 3 of the amendment of June 20, 1950, to the collective bargaining agreement is helpful in ascertaining the date from which the employer was required to make deductions, even though that paragraph primarily refers to a different situation than the one of immediate interest. Consequently the following analysis will relate, first, to the deduction date required in the scheme of insurance contemplated by paragraph 3. Then the relationship between paragraphs 2 and 3 will be considered. The reason that the amendment contemplated two different schemes of employee-insurance was that the amendment constituted the end result of lengthly negotiations between bargaining committees, some of which represented lumber companies and others represented various locals of the International Woodworkers of America. The purpose of the committees was to reach agreement upon recommendations suitable to the individual units which they represented, and therefore they took into account the fact that some of the employers already had group insurance for their employees.

Paragraph 3 of the amendment reads:

"Where an employee benefit program is now in effect in an operation, Employer shall receive credit

for his contribution to such program, and said program may be supplemented to the extent set forth above.''

We think that the words ''receive credit for his contribution'' refer to the extent of the employer's obligation as a result of the wage increase which became effective May 1, 1950. Therefore, they must also refer to the deduction date, that is, the date from which the employer was to receive credit under the scheme contemplated by paragraph 3. However, that paragraph does not specifically indicate whether the employer was to have received credit from the date of the wage increase May 1, 1950, or that of the amendment June 20, 1950, which are the only two reasonable possibilities under the plan of paragraph 3. If the latter date was to have been the deduction date, the employer would have been obligated for the month of May and part of June to the extent of 7½ cents per hour wage increase, as well as the premium payments on the plan in existence. However, after June 20, 1950, the employer would have been obligated only to the extent of 7½ cents per hour wage increase. If the parties had intended that the employer's duties should not have been uniform throughout the term of the contract, we think that they would have used language more appropriate to that purpose. Consequently we believe that under paragraph 3, the deduction date, and therefore the credit date, is May 1, 1950, which makes the employer's duties under the amendment uniform throughout the term of the contract. Therefore, if the insurance program in issue were the same as that contemplated by paragraph 3, deductions would have been required for May and June.

■ Paragraph 3 is related to paragraph 2 inasmuch as paragraph 2 is the only part of the amended agree-

ment which specifically refers to the deductions which are required under either paragraph. In addition, paragraph 3 expressly states that the program mentioned therein "may be supplemented to the extent set forth above." Since paragraph 2 is the only place where the deductions are authorized, it seems more reasonable than not that the parties intended that all deductions that were required by that paragraph were to have been made from the same date. For, if the parties wished the deduction date under the scheme mentioned in paragraph 3 to have been different from that in paragraph 2, they surely would have used language to suggest such an intention. Therefore, we conclude that deductions should have been made from May 1, 1950. We further conclude that the employer was required to make deductions for the months of May and June and remit them to the insurers designated by the union.

The foregoing is our construction of the parts of the amended bargaining agreement upon which the parties disagree. It constitutes our answer to their prayer for a declaration of rights. There remains for attention the petition for additional relief, for, it will be recalled, that the union has asked for specific performance of the collective bargaining agreement.

After the briefs in this appeal were filed, the respondent (employer) moved to dismiss the appeal upon the ground that after notice of appeal was given, the issues had become moot. The motion was accompanied with affidavits which disclosed that (1) effective April 30, 1952, the insurance written by John Hancock Mutual Life Insurance Company was cancelled; (2) April 30, 1950, to December, 1950, no health or welfare insurance was in effect, and the employer made no deductions from the wages of its employees in that

period; (3) effective December 15, 1952, a contract was entered into between the union and the Western States Life Insurance Company for health and welfare insurance which was supplemented with another policy written by United Pacific Insurance Company. The insurance provided by those policies was offered to the employees upon a voluntary basis. Still later the policies just mentioned were cancelled and other contracts of insurance were effected between the union and other insurance companies.

It seems plain that specific performance of the collective bargaining agreement is impossible. A perusal of the contract which was effected between the union and the John Hancock Life Insurance Company induces a belief that the 89 dissidents were never insured by that company. If that is so, then that insurance company is not entitled to anything more in the form of premiums than it has received. At any rate, that company is not a party to this case and is asking for no relief. The union frankly concedes that it is not entitled to the award of a money judgment. It asks for no relief of that character. The sums of money which the employer failed to deduct from the wages of its employees in the period May 1, 1950, to July 1, 1950, should have been paid to the insurance company, but they were actually paid to the employees. It will be recalled that in the period July 1, 1950, to August 1, 1950, the employer, in lieu of paying the sums to the insurance company for the 89 dissidents, paid to those individuals their entire wages. But, if we understand the situation correctly, the life insurance company failed to include those 89 among those whom it insured. August 1, 1950, to the present time the employer has made the required deductions from the wages of the

dissidents and has deposited the sums into a fund awaiting the outcome of this case.

The collective bargaining agreement was valid, as we have held in preceding paragraphs, and it may be that if the union had acted promptly specific performance might have been an appropriate remedy. But, under the circumstances with which we are confronted, the union, in our belief, is entitled to nothing but damages. The record, however, discloses no injury for which the union is entitled to compensatory damages. We think that the union's primary purpose throughout has been to obtain a declaration of rights. Under the circumstances, the union will be awarded nominal damages in the sum of $10.00.

We know of nothing which can be done with the wages which the plaintiff has withheld from the dissidents and which it has deposited in a fund awaiting the outcome of this appeal except to order the plaintiff to pay those sums to those 89 dissidents.

Since we are satisfied that both parties have acted in good faith and were confronted with a situation bereft of precedents, we think that each should bear its own costs and disbursements; therefore, none will be awarded.

To the extent indicated above, the judgment and decree of the circuit court is reversed. The cause is remanded with instructions to enter a decree in conformity with the above.

ON PETITION FOR REHEARING

*A. L. Couty,* Coos Bay, for the petition.

Before WARNER, Chief Justice, and ROSSMAN, LUSK, BRAND, LATOURETTE and PERRY, Justices.

ROSSMAN, J.

The defendant-respondent, Arnold L. Couty, has filed a paper in this cause which we will treat as a petition for a rehearing. In it Mr. Couty expresses a belief that our decision failed to give heed to the contentions which he contributed when he submitted his brief. The latter, scarcely seven pages long, was prepared by Mr. Couty, who is not a member of the bar.

We bestowed upon this appeal painstaking care before we reached our conclusion. When we stated in our decision the issues submitted by the appeal, we had in mind Mr. Couty's contentions, as well as those which came from the other parties. Before reaching our decision, we examined not only all of the contentions advanced by the parties, but carried our analysis beyond the scope of their briefs and citations. We inferred that this case might be a harbinger of others arising out of the recurring developments in the employer-employee relationship.

■ Mr. Couty believes that we overlooked the constitutional provisions upon which he depended. In his brief he said: "One issue before the court is to determine whether or not the provisions of a collective bargaining agreement must be in pursuance of the Constitution of the United States." Obviously, it must be.

Next, Mr. Couty's brief declared: "A second issue before the court is the power of the courts of Oregon arising under Art. 6, of the Constitution." At that point Mr. Couty quoted Article VI, which says, in part: "This Constitution and the laws of the United States which shall be made in pursuance thereof  *  *  * shall be the supreme law of the land." No one connected with this case has challenged the validity of the

Labor Management Relations Act of 1947 (Taft-Hartley). We gave that act full effect as "the supreme law of the land." We do not understand that Mr. Couty claims that we misinterpreted the act.

■ Mr. Couty next declares: "A third issue before the court is odd, indeed. An attempt to delegate the jurisdiction of justiciable cause, in this case over the employee's wages, to the collective bargaining agreement has been successful as evidenced by court decisions cited by counsel for the appellants. Such court decisions are in error." Mr. Couty's brief contains no citations whatever to any court decisions, textbook or to any statute. We believe that the Labor Management Relations Act of 1947 does not attempt to delegate to any union jurisdiction over any "justiciable cause." The part of it which is germane to this case manifests no concern whatever over any "justiciable cause" but defines and places limitations upon the authority which may be exercised by a union. Its purpose is to facilitate orderly bargaining and to define the subjects which are liable to collective bargaining.

Finally, Mr. Couty cites the part of Article I, § 10, Constitution of the United States, which says: "No state shall * * *; make anything but gold and silver coin a tender in payment of debts." He argues that the provisions just quoted enabled every employee of the Coos Bay Lumber Company to demand payment to him in "gold and silver" of the wage increase granted by the collective bargaining agreement.

■■ The difficulty with the contention just mentioned is that the wage increase and the provision for a health and social welfare program were complementary to each other. The provision for a wage increase was the means whereby the grant of the other benefit was to be financed. No employee was at liberty to accept one

of them and reject the other. The collective bargaining agreement provided:

"Upon execution of this agreement in his behalf by the Union and so far as is consistent with law each employee covered by this agreement authorizes and directs Employer to deduct from his earnings each month the sum of not more than 7½¢ for each hour worked by him and pay said sum to such insurance carrier, * * *."

Accordingly, if the agreement had not been "consistent with law", the wage increase would have been payable to the employees, including Mr. Couty, and Article I, § 10, would have fixed the medium of payment. But, since the agreement was valid, all of the employees received the benefit of the health and welfare insurance program. The cost of that benefit was precisely the same as the wage increase, and, therefore, no debt to any employee, payable in gold and silver, resulted from the wage increase. No employee could reject the health and welfare insurance program and, since its cost completely absorbed the wage increase, the latter yielded nothing upon which Article I, § 10, could operate.

It was reasons of the above kind that brought us to our previous decision. We are satisfied that the latter is sound. We have given careful attention to the attack upon our decision, but abide by the latter.

The petition for a rehearing is denied.