[Civ. No. 22241. Second Dist., Div. One. Aug. 1, 1958.]

J. W. BERNARD et al., as Trustees, etc., Plaintiffs and Appellants, v. INDEMNITY INSURANCE COMPANY OF NORTH AMERICA, Defendant and Appellant.

*Assigned by Chairman of Judicial Council.

George M. Cox and Charles P. Scully for Plaintiffs and Appellants.

Johnson & Stanton, Gardiner Johnson and Thomas E. Stanton, Jr., as Amici Curiae on behalf of Plaintiffs and Appellants.

Anderson, McPharlin & Conners and Kenneth E. Lewis for Defendant and Appellant.

Bohnert & McCarthy and Arthur M. Bohnert, Jr., as Amici Curiae on behalf of Defendant and Appellant.

FOURT, J.—This is an appeal from a judgment which ordered the dismissal of the action as against the respondent surety company after sustaining of a demurrer to the amended complaint without leave to amend.

There appears to be no serious dispute as to the facts of the case. Appellants constitute the board of trustees of the Carpenters Health and Welfare Trust for Southern California (sometimes hereinafter referred to as the "Trust Fund"), which Trust Fund was established pursuant to a collective bargaining agreement (sometimes hereinafter referred to as the "Master Labor Agreement").[1]

---

[1]The pertinent provisions of the Trust Fund are as follows:
*Article II*:
"Section 1.

"(a) There is hereby created the Carpenters Health and Welfare Trust for Southern California, which shall consist of all contributions

The Master Labor Agreement was executed in 1954 by and between the Associated General Contractors of America, Southern California Chapter, the Building Contractors of California, Inc., the Excavating and Grading Contractors As-

made into the Fund and all interest, income, and other returns thereon of any kind whatsoever, together with the policies and all property and assets of the Fund.

"(b) Such amounts are held in trust for the purpose of paying, either from principal or income or both, for the benefit of the employees, their families and dependents, for medical or hospital care, or insurance to provide any of the foregoing, or life insurance, or non-occupational disability and sickness insurance, or accident insurance.

"Section 2. The Fund shall have its principal office in the County of Los Angeles, State of California.

"Section 3. Contributions to the Fund shall not constitute or be deemed to be wages due to the employees with respect to whose work such payments are made, and no employee shall be entitled to receive any part of the contributions made or required to be made to the Fund in lieu of the benefits provided by the Health and Welfare Plan.

"Section 4. Neither the Employers, any signatory association, any employer, the Unions, any signatory union, any employee, any beneficiary of the Health and Welfare Plan nor any other person shall have any right, title or interest in the Fund other than as specifically provided in this agreement, and no part of the Fund shall revert to the Employers, any signatory association, or any employer. Neither the Fund nor any contributions to the Fund shall be in any manner liable for or subject to the debts, contracts or liabilities of the Employers, any signatory association, any employer, the Unions, any signatory union, any employee, or any beneficiary. No part of the Fund, nor any benefits payable in accordance with the Health and Welfare Plan shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge by any person; provided, however, that the Board of Trustees may establish a procedure whereby any employee may direct that benefits due him be paid to an institution in which he is hospitalized in consideration for medical or hospital services rendered or to be rendered."

*Section 1 (a) of Article IV:*

"The Fund shall be administered by a Board of Trustees which shall consist of ten (10) trustees. Five (5) trustees shall be appointed by the Unions (known as Union Trustees) and five (5) trustees shall be appointed by the Employers (known as Employer Trustees)."

*Article V:*

"Section 1. The Board of Trustees shall have power to administer the Fund and to administer and maintain the Plan in effect.

"Section 2. The Board of Trustees shall collect and receive all contributions due to the Fund, and shall promptly deposit such contributions in a special trust fund account or accounts established in a reputable bank or banks located in such locality as determined by the Board of Trustees.

"Section 3. The Board of Trustees shall have power to demand and enforce the prompt payment of contributions to the Fund, and the payments due to delinquencies as provided in Section 3 of Article III. If any individual employer defaults in the making of such contributions

sociation, Inc., and the Home Builders Institute, Inc., on behalf of their respective contractor-employer members engaged in construction work in 11 Southern California counties, and the United Brotherhood of Carpenters and Joiners of America, on behalf of the carpenter-employees of said contractor-employer members. The Master Labor Agreement contains provisions relating to the wages, hours and working conditions of the carpenter-employees of said members in the Southern California area.

Article XXI of the Master Labor Agreement provides as follows:

"The parties agree to establish a joint Health and Welfare Trust Agreement between the Contractors and the Carpenters. Effective September 1, 1954, the Contractors shall make payments to the Health and Welfare Fund of 5¢ per hour worked per employee under this Agreement. Effective May 1, 1955, payments to the Health and Welfare Fund by the Contractor shall be increased 5¢ per hour. The establishment of the Joint Trust Fund and other terms and conditions of the Health and Welfare Plan shall be completed by a joint committee. Benefits to workmen shall commence not later than six months from September 1, 1954. This provision shall remain in full force and effect and not subject for re-opening through April 30, 1957."

The Trust Fund was established by the same parties as those who negotiated the Master Labor Agreement.

About August 27, 1954, Hudson Construction Company

---

or payments and if the Board consults legal counsel with respect thereto, or files any suit or claim with respect thereto, there shall be added to the obligation of the employer who is in default, reasonable attorneys' fees, court costs, and all other reasonable expenses incurred by the Board in connection with such suit or claim.

"Section 4. The Board of Trustees shall collect and receive any and all dividends, interest, returns of premiums or other credits or benefits due from any insurer or otherwise, which the Fund is entitled to receive and shall deposit the same in the Fund or credit the same to the Fund, and all such deposits and credits shall become part of the Fund and shall be used for the purposes stated in this agreement.

"Section 5. The Board of Trustees shall promptly use the monies available in the Fund first to provide the benefits specified in the Plan. The Board shall have power to enter into contracts and procure insurance policies necessary to place into effect and maintain the Plan, to terminate, modify or renew any such contracts or policies subject to the provisions of this agreement and the collective bargaining agreements, and to exercise and claim all rights and benefits granted to the Board or the Fund by any such contracts or policies. Any such contract or policy may be executed in the name of the Fund, and any such policy may be produced in such name."

(sometimes herein referred to as the "Contractor") executed a collective bargaining agreement with the Building and Construction Trades Councils of the 11 Southern California counties (sometimes herein referred to as the "Agreement"), which provided, in effect, that the Contractor would be bound by the Master Labor Agreement.

During the effective period of the agreement, the Contractor employed construction carpenters on four construction projects of various school districts in Los Angeles County. The Contractor, pursuant to the provisions of Government Code, sections 4200-4208, provided the school districts with four separate bonds (though not identical), each applicable to one of the four construction contracts.[2]

It was claimed that the Contractor failed to make certain of the payments to the Welfare Fund. An action was filed by the trustees of the Trust Fund against the Contractor and the surety company to collect the amounts due. The amended complaint incorporated, as exhibits, the bonds in question, the agreement between the Contractor and the Council, the Master Labor Agreement and the agreement and declaration of trust.

The surety company filed a demurrer which was sustained without leave to amend, and this appeal followed from the judgment which was thereafter entered.

Indemnity Insurance Company of North America filed a cross-appeal because the court refused to grant it attorney's fees as costs. In view of our decision on the plaintiffs' appeal, little if anything, need be said with reference to the cross-appeal.

The issue is whether, under the provisions of the Government Code, the surety is liable to the appellants for the unpaid Health and Welfare contributions which the Contractor agreed to make to the Fund.

Counsel in this matter have been of the utmost assistance

---

[2]Government Code, section 4204:

"To be approved, the contractor's bond shall provide that if the person or his subcontractors, fail to pay for any materials, provisions, provender or other supplies, or teams, used in, upon, for or about the performance of the work contracted to be done or for any work or labor thereon of any kind, or for amounts due under the Unemployment Insurance Act with respect to such work or labor, that the surety or sureties will pay for the same, in an amount not exceeding the sum specified in the bond, and also, in case suit is brought upon the bond, a reasonable attorney's fee, to be fixed by the court."

to the court through the filing of their complete and comprehensive briefs.

The payment of the contributions to the Health and Welfare Fund is obviously in payment for labor. It would seem to be apparent that if the agreement between the Contractor and the Union provided that the Contractor pay the carpenter five or ten cents per hour above the prevailing wage rate, and the carpenter had, by contract with the union, agreed to contribute that sum to the Health and Welfare Fund, the surety would have been obligated to make good any default in Contractor's payments of the extra five or ten cents per hour. The surety asserts, in substance, that when the amounts are paid directly to the Fund, then a different rule must prevail. We are of the opinion that under the circumstances no such fine legal distinction can be drawn.

The theory or philosophy of health and welfare plans is commendable. As stated in a United States Senate Committee report, "The existence of welfare and pension programs is a tribute to the free enterprise system. They constitute an important underpinning of our economic security, broadening and supplementing the various governmental programs." Under the plan, the Contractor, by contributing a fixed amount per hour of work to a trust fund, administered by representatives of labor and industry, can provide benefits for employees greater than could be purchased by the individual for the same amount of money. Also, the worker who, by the nature of his craft, is required to shift from one employer to another can pool his credits with the Fund and thereby secure continued protection. It was appropriately said in *Coos Bay Lumber Co.* v. *Local 7-116, International Woodworkers of America*, (CIO), (1955) 203 Ore. 342 [279 P.2d 508, 280 P.2d 412], at page 512 [279 P.2d]:

". . . Since such plans are mandatory subjects for collective bargaining, a union has authority to obtain a wage increase for its members in the form of an employer-paid insurance plan. It follows therefore, that it also has the power to obtain a wage increase to be applied for the purchase of insurance as the union directs. Both situations involve substantially the same thing: a wage increase which takes the form of group insurance. As compared with the situation where a collective bargaining agreement provides for a so-called employer-paid plan, a contract between an employer and a union, such as the one before us, only indicates more specifically what such a group insurance plan really is when

it provides that it is to be financed by a wage increase. Therefore, the distinction between employer-paid and employee-paid plans is at best one of form, not of substance, and the rights of the parties are the same in the two situations. *International Woodworkers of America, Local 6-64, C.I.O.* v. *McCloud River Lumber Co.*, D.C., 119 F. Supp. 475, 486, in interpreting the provisions of a health and welfare insurance program substantially the same as the one before us, said:

" 'To this Court, the difference between ''a wage increase intended as the method of financing the health and welfare plan'' and ''a wage increase to pay for a Health and Welfare Program for the employees seems like the difference between tweedledum and tweedledee!'' ' "

In *United States* v. *Carter* (1957), 353 U.S. 210 [77 S.Ct. 793, 1 L.Ed.2d 776], the Supreme Court had occasion to interpret the Miller Act, a federal law, designed to protect those supplying labor for the construction of federal buildings. The agreement involved in the Carter case was a collective bargaining agreement and provided for the payment of seven and one-half cents an hour to trustees of the Health and Welfare Fund, the trustees to use the money to purchase various types of life, accident, hospitalization and surgical benefit insurance for the laborer, as in the instant case. In the Carter case, as here, the laborer had no rights to the contribution except as provided in the trust agreement, and it was provided that the contributions should not constitute or be deemed to be wages. In the Carter case the contractor became insolvent after completing the construction work and paying the laborers their wages. The contractor was unable to make the contribution to the trustees, who then brought an action against the contractor's surety who had issued a bond similar to the bonds in question in this case. While we are mindful that the opinion of the Supreme Court in the Carter case is not necessarily binding upon us in this matter, nevertheless what was said by the court in that instance is very cogent. After stating, in effect, that the surety's liability on the bond must at least be co-extensive with the obligations imposed by the act, and that the trustees' rights against the surety depend upon and are measured by the statutory provisions, the court said (at 1 L.Ed.2d, pp. 782-784):

" 'The Miller Act, like the Heard Act, is highly remedial in nature. It is entitled to a liberal construction and application in order properly to effectuate the Congressional intent

to protect those whose labor and materials go into public projects. [Citing cases.] But such a salutary policy does not justify ignoring plain words of limitation and imposing wholesale liability on payment bonds.' *Clifford F. MacEvoy Co.* v. *United States,* 322 U.S. 102 [64 S.Ct. 890, 88 L.Ed. 1163]. . . .

''The Miller Act represents a congressional effort to protect persons supplying labor and material for the construction of federal public buildings in lieu of the protection they might receive under state statutes with respect to the construction of nonfederal buildings. The essence of its policy is to provide a surety who, by force of the Act, must make good the obligations of a defaulting contractor to his suppliers of labor and material. Thus the Act provides a broad but not unlimited protection.

''. . . The unpaid contributions were a part of the compensation for the work to be done by Carter's employees. The relation of the contributions to the work done is emphasized by the fact that their amount was measured by the exact number of hours each employee performed services for Carter. *Not until the required contributions have been made will Carter's employees have been 'paid in full' for their labor in accordance with the collective-bargaining agreements.*

''The surety suggests that Carter's obligation to contribute to the fund was not covered by the statutory bond because that obligation was not set forth in his construction contract with the United States, but appeared only in the master labor agreements. Those labor agreements were also the source of Carter's obligation to pay the 'wages' payable directly to his employees, an obligation concededly guaranteed by the bond. . . .

''The surety also argues that the trustees are not entitled to recover the promised contributions under § 2(a) of the Miller Act, since they are neither persons who have furnished labor or material, nor are they seeking 'sums justly due' to persons who have furnished labor or material. An answer to this contention is found in cases arising under the Heard Act involving suits by assignees of the claims of persons furnishing labor or material. Such assignees were not the persons who had furnished the labor or material for which the claims were made. They did not seek 'sums justly due' to persons who had themselves furnished labor or material, since the assignments had extinguished the right which those persons

had to the performance of the contractors' obligation. Yet these cases established that assignees of the claims of persons furnishing labor or material came within the protection of the statutory bond. . . .

"If the assignee of an employee can sue on the bond, the trustees of the employees' fund should be able to do so. Whether the trustees of the fund are, in a technical sense, assignees of the employees' rights to the contributions need not be decided. Suffice it to say that the trustees' relationship to the employees, as established by the master labor agreements and the trust agreement, is closely analogous to that of an assignment. The master labor agreements not only created Carter's obligation to make the specified contributions, but simultaneously created the right of the trustees to collect those contributions on behalf of the employees. The trust agreement gave the trustees the exclusive right to enforce payment. The trustees stand in the shoes of the employees and are entitled to enforce their rights.

"Moreover, the trustees of the fund have an even better right to sue on the bond than does the usual assignee since they are not seeking to recover on their own account. The trustees are claiming recovery for the sole benefit of the beneficiaries of the fund, and those beneficiaries are the very ones who have performed the labor. The contributions are the means by which the fund is maintained for the benefit of the employees and of other construction workers. For purposes of the Miller Act, these contributions are in substance as much 'justly due' to the employees who have earned them as are the wages payable directly to them in cash."

It will be noted that section 4204 of the Government Code does not limit the surety's liability to the payment of "wages," but refers to the contractor's failure to pay for "any work or labor."

█ Our view is that the trustees can properly bring an action such as the one under consideration. Section 4205 of the Government Code specifically provides that the bond shall, by its terms, inure to the persons therein named "or their assigns in any suit upon the bond." (See *French* v. *Powell,* 135 Cal. 636 [68 P. 92]; *Hub Hdw. Co.* v. *Aetna Acc. etc. Co.,* 178 Cal. 264 [173 P. 81].) The trustees, in this instance, are the assignees under an equitable assignment of the rights and claims of the carpenters, and as such have the right to sue under the circumstances. (See *Matter of Henry B. Otto,* 146 F. Supp. 786; *McIntyre* v. *Hauser,* 131 Cal. 11,

14 [63 P. 69]; *Goldman* v. *Murray,* 164 Cal. 419, 422 [129 P. 462]; *Thorpe* v. *Story,* 10 Cal.2d 104, 114 [73 P.2d 1194]; *City of Oakland* v. *California Construction Co.,* 15 Cal.2d 573, 578 [104 P.2d 30]; *City of Oakland* v. *De Guarda,* 95 Cal. App. 270, 285 [272 P. 779, 273 P. 819].)

In a recent case, *In re Embassy Restaurant* (U.S.C.A., Third Circuit), 254 F.2d 475 (April, 1958), the court had under consideration a situation wherein the contractor had gone bankrupt and had not paid specified amounts to the Welfare Fund. In the employer's bankruptcy proceeding the trustees of the Welfare Fund filed proofs of claim, seeking priority over tax claims of the United States. The district court granted the wage priority to the employer contributions and the government appealed. The appellate court said, in affirming the district court (at pages 477-478):

"Union Funds providing welfare benefits to employees through employer contributions contracted for in collective bargaining agreements play an essential and ever growing part in our industrial economy. We are firmly convinced that unions bargain for these contributions as though they were wages, and further that industry considers the contributions as an integral part of the wage package. See Note, 66 Yale L.J. 449, 460 (1957). The contributions are in a true sense the agreed compensation for services rendered and as such must be considered wages. For this reason we are constrained to disagree with the view of the Second Circuit in the Hack decision and to affirm the decision of the district court here."

The respondent maintains that we are bound to a limited and strict interpretation of the statute in question; that health and welfare contributions were not even known when the statute in question was adopted in 1919, and that therefore the Legislature never intended that a statutory bond should include such health and welfare payments. The respondent admits however, that "[t]he purpose for which such labor and material bonds are executed is for the benefit of laborers and materialmen. (Citing cases.) It has been held that such statutes and bonds should be liberally construed to effect the purpose of the Legislature. (Citing cases.)"

Respondent also asserts that the section in question, namely section 4204 of the Government Code, was amended in 1947 to make the bond expressly cover State Unemployment Insurance Act taxes, and that therefore, in effect, it was the intention of the Legislature, by including one additional

obligation, to exclude any other. A complete answer to any such contention is that unemployment insurance *taxes* are a government imposed obligation, whereas health and welfare payments are mutually agreed to obligations in return for work.

Our California courts, in many instances, have interpreted the bond statute in question, with reference to what constitutes "materials" or "supplies." In *Pacific Wood & Coal Co.* v. *Oswald* (1919), 179 Cal. 712, at pages 714-716 [178 P. 854], the court set forth:

". . . Since the filing of the briefs herein, this court has had occasion to consider the effect of statutes like the one here involved, and has, in at least two cases, declared that such statutes must be given a broader construction than had, perhaps, been thought to be proper theretofore. . . . The federal decisions, cited in the Sherman case, unite in giving to the statute and the bond a liberal interpretation, and hold, accordingly, that the obligation of the sureties will cover such items as cartage and towage of materials, rental of cars and other equipment used by the contractor, freight charges in transporting materials, and even the cost of provisions used by a contractor in feeding his employees, where the location of the work rendered the furnishing of such board necessary. A similar result was reached by Department One in *Bricker* v. *Rollins,* 178 Cal. 347 [173 P. 592],. . . . The opinion in that case did, it is true, refer to the inclusion in the statute and the bond of the 'more comprehensive word "supplies." ' It relied, however, on the authority of the Sherman case and the cases there cited. In their reasoning, as well as in their citation of authority, the Sherman and the Bricker cases must, therefore, be regarded as authority for the conclusion that items like the one here claimed are recoverable under a bond requiring payment for 'materials furnished for or in the doing of the work,' irrespective of the presence or absence of the word 'supplies.' "

Also, in the case of *Williamson* v. *Egan,* 209 Cal. 343 [287 P. 503], the court, in passing upon what the surety company was liable for, stated in effect that it was not disposed to give a narrow construction to the terms of the bond and said (at p. 349), "The bond sued upon here is one required by statute and its provisions are to be liberally construed to effectuate its purpose. (*Continental Nat. Bank* v. *Republic Cas. Co.,* 202 Cal. 586, 589 [262 P. 300]. . . .)"

And, in *A. L. Young Machinery Co.* v. *Cupps,* 213 Cal. 210,

at pages 213-214 [2 P.2d 321], the court said: "It has repeatedly been held in reference to the 1919 act, and its predecessors, that such acts are to be more liberally construed than the mechanic's lien statute, and that the reasons for giving a limited construction to the latter are not applicable to the former. (Citing cases.) It has been held under the 1919 act and similar public work statutes that rental of machinery, money expended on the hiring of mule teams, money spent for provisions, harness and other equipment, including scrapers, freight on mules and equipment, etc., are all recoverable against the surety. (Citing cases.)" (See also *McCormick Saeltzer Co.* v. *Haidlen,* 119 Cal.App. 96 [6 P.2d 255], and *Christie* v. *Commercial Casualty Ins. Co.,* 6 Cal.App.2d 710, 715 [45 P.2d 263].)

It would appear that if the words "materials" and "supplies" are to be given the broad interpretation and meaning indicated by the cited cases as proper, then surely the words "pay for . . . any work or labor thereon of any kind," as used in the same bond mean more, and should be construed to include more than just basic hourly wage rates.

It is our conclusion that the contributions sought to be recovered are directly related to the work performed in the construction of the school projects by the contractor. The amounts became due solely because the work was performed, and the sum is measured by the number of hours of work performed.

The Legislature intended to protect the laborer as to every element of his compensation, whether that compensation be an hourly wage, or whether it be an hourly wage plus other benefits, and the novelty of the health and welfare provisions of the contract does not in any wise prevent the contributions therefor from being considered as payments for "any work or labor" on the bonded project.

The judgment is reversed and the cause remanded with directions to the court below to overrule the demurrer and allow defendants a reasonable time within which to answer the complaint herein if they be so advised.

White, P. J., and Lillie, J., concurred.

The petition of defendant and appellant for a hearing by the Supreme Court was denied September 24, 1958.