Argued January 7; reversed March 4; rehearing denied
April 8, 1941

# ALLEN ET AL. *v.* SOUTHERN PACIFIC CO. ET AL.

(110 P. (2d) 933)

Before KELLY, Chief Justice, and BELT, BAILEY, RAND and ROSSMAN, Associate Justices.

*Frank C. Hanley*, of Portland, for appellants.

*K. C. Tanner*, of Portland, and *Arthur K. Mc-Mahan*, of Albany, for Minor Allen et al.

*Alfred A. Hampson*, of Portland, for Southern Pacific Co.

RAND, J. This is a suit for a declaratory decree. The plaintiffs are trainmen employed on the Portland division of the Southern Pacific Company and are members of the Brotherhood of Railroad Trainmen. The defendants, except the Southern Pacific Company, which occupies a neutral position between these litigants, are members of the Brotherhood and, with the exception of certain officers thereof, are employed as trainmen on the Shasta division of said company. These two divisions are under different railroad superintendents and each constitutes a separate seniority district.

The plaintiffs allege in their complaint that the trainmen of the Portland division are entitled to man and handle all through freight trains over that part of the Shasta division between Crescent Lake and a point 6.3 miles south of Klamath Falls, Oregon, under an alleged seniority right which they claim to possess as trainmen of the Portland division.

The defendants deny that the plaintiffs are entitled to the relief sought or any part thereof, and allege that all matters in controversy between the trainmen of the two divisions were settled and finally determined by the duly authorized officers of the Brotherhood in accordance with the established practice and rules of the Brotherhood and that the settlement so made is binding upon all the parties to this litigation.

The cause was tried in the circuit court for Multnomah county and a decree was there entered setting aside said settlement and awarding to the plaintiffs rights not granted by the Brotherhood and contrary to the terms of said settlement. From this decree, the defendants have appealed.

There is no allegation in the complaint that the Brotherhood or any of its officers, in settling this controversy between the trainmen of these two divisions, were acting fraudulently or in bad faith, but plaintiffs contend that these officers misconstrued and failed to give proper effect to the constitution and general rules of the Brotherhood and, for that reason, the settlement is invalid and not binding upon the plaintiffs. This is denied by the defendants who assert that the Brotherhood of Railroad Trainmen has the power to settle all conflicting claims of its members to seniority rights and that, in the absence of fraud or bad faith, its decisions upon such questions are final and conclusive upon all its members.

The Brotherhood of Railroad Trainmen is a voluntary, unincorporated organization of railroad trainmen having subordinate lodges in different parts of the United States and Canada, with its Grand Lodge located in Cleveland, Ohio. It was organized in 1883

and includes in its membership a great majority of the trainmen employed on the various railroads in each of said countries. As in the case of other voluntary, unincorporated associations, the relation existing between the Brotherhood and its members is contractual. Its constitution and general rules are binding upon the Brotherhood and likewise upon all its members, all of whom are chargeable with knowledge of the laws and general rules of the organization. All persons, upon becoming members of such an organization, are deemed to have agreed to be bound by its laws and general rules except where they involve a surrender of a personal or constitutional right or contravene the public law or public policy.

It is clear that the settlement of disputes of this character does not contravene any public law and that, when settled in accordance with the constitution and general rules of the Brotherhood, no personal or constitutional right of any of the parties to the controversy is or can be invaded. The settlement of such questions requires the knowledge and experience of highly trained men who have long been engaged in railroad service and who are entirely disinterested and preeminently qualified to decide such matters. The courts ought not to interfere with their decisions when honestly made. There is no suggestion in this record of more than 2100 pages of testimony that any official of the Brotherhood was not acting in entire good faith in rendering the decisions hereinafter referred to.

The plaintiffs base their claim for seniority rights over parts of the Shasta division upon a change made by the railroad company in 1926 in routing its through freight trains over a new line of railroad between

Black Butte, California, and Springfield Junction, Oregon, known as the Natron Cut-off, and upon diversions subsequently made from the old to the new line of through freight trains.

Prior to 1926, the company had only one line of railroad between said points, Ashland being the division point between said divisions. Prior to the construction of the Natron Cut-off, the Portland division trainmen manned all trains which ran between Ashland and Springfield Junction, a distance by rail of 215.2 miles, and the Shasta division trainmen manned all trains between Ashland and Black Butte, a distance by rail of 84.1 miles. The company at that time had a branch line from Springfield Junction to Oakridge, a distance by rail of 39.4 miles, which was in the Portland division. It also had another branch line in the Shasta division, extending from a point near Black Butte to Kirk by way of Klamath Falls, a distance by rail of 125.1 miles, which was operated by the trainmen in the Shasta division. Over these branch lines, in their respective districts, the trainmen of these two divisions had acquired seniority rights.

In that year the company completed the construction of a new line of railroad from Kirk to Oakridge, a distance by rail of 110.2 miles, which, together with the two branch lines above referred to, constitutes the Natron Cut-off and the division point on that line was established at Crescent Lake, which, by rail, is 58.3 miles from Kirk and 51.9 miles from Oakridge.

In constructing the line between Kirk and Oakridge, the trainmen of the Portland division manned the trains which hauled the supplies and materials used in the construction of the road as far as Crescent Lake and the trainmen of the Shasta division performed

the same services between Kirk and Crescent Lake. The evidence shows that, by rendering these services, the trainmen of each division acquired seniority rights in their respective territories as far as Crescent Lake.

On July 17, 1926, the general manager of the defendant company notified the general chairmen of the Order of Railway Conductors and of the Brotherhood of Railroad Trainmen that the company proposed to begin operations over the newly constructed Natron Cut-off on or about September 1, 1926, and suggested that a conference be held to decide upon the proper distribution of crews or apportionment of mileage between the Portland and Shasta divisions.

Pursuant to such notice, the matter was taken up in the regular way by both organizations, first through their local and then their subgeneral committees and, they being unable to agree, the matter was submitted to the Grand Lodge officers of the two organizations for settlement. At a meeting held in Chicago on June 9 and 10, 1927, at which there were present the chief executives, the vice-presidents and the general chairmen of the Brotherhood of Railroad Trainmen and of the Order of Railway Conductors, an agreement was reached, settling the entire controversy and, in conformity to such settlement, a contract was entered into with the defendant company on August 4, 1927, which provided as follows:

"1. Twelve unpromoted freight brakemen to be transferred from the Portland division to the Shasta division, to become and be permanent employes of the Shasta division, said twelve brakemen to be given seniority as brakemen on the Shasta division from the date of their employment as brakemen on the Portland division.

"2. All passenger assignments operated between Portland-Klamath Falls and Klamath Falls-Portland or between Klamath Falls-Eugene and Eugene-Klamath Falls, to be considered interdivisional assignments and manned by brakemen and train baggagemen from each division according to the mileage run on each division.

"It is suggested that a bulletin be posted for 30 days on the Portland division, for twelve unpromoted freight brakemen to be permanently transferred to the Shasta division, the senior applicants to be transferred.

"Interdivisional assignments in passenger service to be filled in accordance with the provisions of Article No. 34, Trainmen's agreement."

An appeal therefrom was taken to the board of directors and from its decision to the board of appeals of the Brotherhood. In both instances, the settlement was upheld. The printed report of the board of appeals, dated April 19, 1936, states that:

"Several attempts were made to re-open the Natron Cut-off case, and many complaints were filed with the President of the Brotherhood, his advice being that only on the ground of newly discovered evidence or changed conditions could further consideration be given to the case by the general committee."

In March, 1935, a resolution was adopted by the Portland local lodge which recited that the diversion of traffic from the old to the new line had been increased since August 4, 1927, by 24 per cent. A copy of this resolution was forwarded to the general secretary of the Brotherhood with a request that the matter be again referred to the general grievance committee of the Brotherhood for further consideration. This resolution was then referred to the president of the Brotherhood. Under the constitution of the Brotherhood, the president decides all questions of law and his

decisions thereon are final unless reversed upon appeal by the board of directors, or by the convention itself. In response to this resolution, the president of the Brotherhood advised the Portland lodge that the settlement of August 4, 1927, was a final settlement of the controversy and would not be a proper subject to be presented to the convention, but he further advised the Portland lodge:

"If as has been set forth in the resolution adopted, new evidence has developed warranting the further consideration of the controversy your Lodge should compile and forward to its General Committee such evidence and it will then be considered by such Committee and if, in the judgment of the Committee the new evidence is sufficient to warrant the reopening or further consideration of the question, my office can be so advised and the subject will be reviewed by me.

"In following the above procedure, however, it must be understood that in event it is held that the new evidence does not warrant the reopening of the controversy, the right of appeal from the original disposition made of the matter will not be reviewed. You may be assured, however, that whatever new evidence is presented will be given careful consideration."

Upon receipt of this letter, the two Portland division lodges brought the matter to the attention of the general grievance committee and a special committee of five was appointed to review the case and report back to the full general committee as to whether or not there was any new evidence in the case. The special committee met in San Francisco and on January 22, 1936, made a report to the general committee of the Brotherhood as follows:

"1. We find that an agreement was made, August 4, 1927, transferring 12 unpromoted trainmen from the Portland Division to the Shasta Division, these trainmen becoming a part of the Shasta Division.

"2. At the time this agreement was made traffic as between the new line and the old line was approximately on the basis of 69% new line and 31% old line.

"3. Subsequently traffic was diverted to the extent that now approximately 93% passes over the new line.

"4. It is evident that the agreement of August 4, 1927, was mainly based on two facts: first, the 69% of traffic that had been at the time diverted to the new line, and second, on the jurisdiction of the superintendent of the Shasta Division.

"5. It is the opinion of your subcommittee that the subsequent diversion of traffic over and above the 69% onto the new line constitutes a new and changed condition."

Shortly thereafter the general chairman wrote to the president, informing him of the action taken by the sub-committee and stated:

"As I understand it, our committee has carried out the instructions contained in your letter of March 29, 1935, and that the case will be reviewed by you in order to determine whether or not the evidence was sufficient to warrant the reopening of the Natron Cut-off case."

Under date of February 19, 1936, the president of the Brotherhood replied to the letter of the general chairman of the general grievance committee, as follows:

"This will acknowledge receipt of your letter of the 10th inst, with reference to consideration given by your full general committee at its recent session to the so-called Natron Cut-off case.

"As I understand it, the resolution adopted by your full general committee does not indicate that there is any 'new evidence' upon which to base a reopening of the original Natron Cut-off case. However,

the full Committee has found that since the original decision was rendered a change has been made in operation of service over the territory comprising the Shasta and Portland divisions.

"It is the prerogative of general committees of the Brotherhood to give consideration to changed conditions, either in operation or otherwise, which arise under their jurisdiction, and to make whatever adjustments may be necessary or desirable to take care of such changed conditions. There would be no reason why your general committee should not give consideration to the alleged changed condition between the Portland and Shasta Divisions, as indicated by the resolution adopted by your full general committee, and thereafter whatever action, if any, is taken by the committee will be subject to the constitutional right of appeal by any member not satisfied therewith."

It appears from the printed annual report for 1936 of the board of appeals of the Brotherhood of Railroad Trainmen that, on January 27, 1936, when the report above quoted was again presented to the full general committee, a motion was made and seconded that the report be accepted up to and including paragraph 5, and that the motion was carried by a vote of 19 "Yeas" and 14 "Nays", one member being absent, and that on March 11, 1936, a sub-general committee was convened to give consideration to the Natron Cut-off case; that this committee consisted of five members who, by divided vote of three to two, sustained for the most part, with some modifications, the recommendations made in said report of the special committee; that an appeal from such action by the sub-committee was taken to the president of the Brotherhood and that he then referred the whole matter to the board of appeals, then being about to convene, for its final determination, and that, after there had been a full discussion and con-

sideration of the matter, the board of appeals rendered the following final decision:

"It is the understanding of the Board that the agreement of 1927 which was approved by the Board of Directors and Board of Appeals, provided that the Shasta Division trainmen were given seniority over the so-called 'Natron cut-off to Crescent Lake.' They were also required to permit 12 unpromoted trainmen to transfer from the Portland to Shasta division in order to compensate the Portland Division for a loss sustained account of the diversion from the old to the new line. These 12 men as well as all other Shasta division trainmen having established seniority in freight and passenger service between Klamath Falls and Crescent Lake, since the effective date of the agreement in 1927, must be recognized as having established the right to man the service, both freight and passenger over the Shasta division which includes the territory between Klamath Falls and Crescent Lake. The appeal of Brother C. M. Hulse of Lodge No. 458 is therefore sustained."

Plaintiffs contend that the board of appeals was without authority to set aside said report of the sub-committee. They assert that the report presented a question of law which should have been submitted to the president of the Brotherhood, whose decision thereon would have been final, subject only to appeal to the board of directors and the convention.

It is difficult to perceive how a finding that there had been an additional diversion of 24 per cent of traffic from the old to the new line, subsequent to the agreement of August 4, 1927, presented a question of law and not a question of fact. Moreover, the appeal from the action taken by the sub-committee was first presented to the president of the Brotherhood and, by him, was submitted to the board of appeals for its decision.

In defining the duties of the president of the Brotherhood, section 9 of the constitution provides:

"* * * He shall be empowered to adjust all grievances referred to him in conformity with the general rules; he shall interpret all laws pertaining to the Brotherhood and shall decide all controversies and appeals referred to him by subordinate lodges or members thereof. Such decisions shall be final unless reversed by the Board of Directors or Board of Appeals at their first meeting after such decisions have been rendered * * *".

Section 86 of the constitution provides:

"The provisions of this Constitution and General Rules shall be interpreted and construed according to their most plain and obvious meaning, and should any doubt arise as to the proper construction of any section or rule thereof it shall be referred to the President of the Brotherhood, whose decision shall be final, unless reversed by the Board of Directors or by the Grand Lodge."

On page 209 of the constitution, as published in 1935, plaintiffs' exhibit 4, is the following ruling:

"It is ruled that if any question as to the application of the law or policy of the Brotherhood arises or is involved in any case pending before the Board of Appeals, the board shall refer such question to the President of the Brotherhood, whose decision thereon, when made, shall be final, subject only to appeal to the Board of Directors and convention, as provided for in section 86."

Section 15-a provides:

"A Board of Appeals, consisting of seven (7) members, shall be elected, to which shall be referred all appeals arising under General Rule No. 10 of the General Rules and Section 149 of the Constitution of the Brotherhood. * * *"

Section 15-b provides:

"It shall be the duty of the Board of Appeals * * * to consider and determine all appeals arising under General Rule No. 10 of the General Rules and Section 149 of Constitution of the Brotherhood which have been appealed to the Board of Appeals. * * * The decision of the Board upon each appeal coming before it shall be in writing, and shall state in clear and concise terms the decision of the Board, ·giving reason and reference to justify and sustain such decision for the information of those interested in the appeal and other members of the Brotherhood. Such decision shall be the final adjudication of any and all rights and questions included in the appeal."

General Rule No. 10 provides:

"Whatever action may be taken by the General Grievance Committee or Board of Adjustment of any system within the meaning of the above General Rules shall be law to the Lodges on that road until and unless reversed by the Board of Appeals. * * * Any member believing an injustice has been done him by the action of a sub-general grievance committee or board of adjustment may, if he desires, appeal to the full General Committee * * * or he may appeal to the Board of Appeals * * *. In the event he decides to appeal his case to the full General Committee or Board of Adjustment and then is not satisfied with such decision he may appeal to the Board of Appeals * * *".

Section 149 of the constitution provides:

"An officer or member believing that an injustice has been done him in a trial, or in case of removal from office, or a decision of his lodge or by any action of the legislative board, may appeal from such action to the President of the Brotherhood * * *

"Should the member, officer or lodge consider the decision of the President of the Brotherhood unjust an appeal to the Board of Directors may be taken, and

if such decision is not satisfactory an appeal to the Board of Appeals (see Section 15-A and B) may be taken, whose decision shall be final. * * *"

Obviously there was no question in the mind of the president of the Brotherhood as to the application of the law or policy of the Brotherhood in connection with the appeal to the board of appeals from the action taken by the sub-committee, for otherwise he would not have referred the appeal to the board of appeals.

■ From these provisions of the constitution and rules of the Brotherhood, it is clear that the board of appeals, which is the court of final resort in the Brotherhood, had undoubted authority to decide the appeal taken from the action of the sub-committee and that its decision upon all the questions presented upon that appeal was final and conclusive upon all the members of the organization and particularly upon these plaintiffs. Under that decision, the agreement of August 4, 1927, was declared by the highest authority existing in the Brotherhood to be in full force and effect and to be a final determination of the seniority rights of all Portland division trainmen to man trains on the Shasta division.

■ It is clear from the various provisions of the constitution and general rules above referred to that the Brotherhood, through its various committees and tribunals, provides an exclusive method of settling all grievances and disputes between its members, including the settlement of their respective seniority rights, and that, in respect to all said matters, the board of appeals is the court of last resort whose decisions are final and conclusive upon all its members. See *Cannon v. Brotherhood of Railroad Trainmen*, 262 Ky. 113, 89 S. W. (2d) 620, and authorities there cited. The con-

stitution expressly provides: "Such decision (of the board of appeals) shall be the final adjudication of any and all rights and questions included in the appeal."

"It is settled law", said the court in *Donovan v. Travers*, 285 Mass. 167, 188 N. E. 705, "that members of an unincorporated, voluntary association, like the brotherhood, are bound by the determination of the association's tribunals if the decision is reached after observance of the formalities it prescribes, after fair opportunity for presenting their case, where there has been no excess of jurisdiction, no bad faith or capricious, unreasonable or arbitrary action. *Richards v. Morison*, 229 Mass. 458, 461, 118 N. E. 868."

■■ There is nothing appearing in this record to show that the decision of the board of appeals, reinstating the agreement of August 4, 1927, was invalidated for any of the causes recited and, hence, that decision concludes and forecloses all claims of the Portland division trainmen to any further or additional seniority rights to man the trains passing over the tracks of the Shasta division. The contention that the officers of the Brotherhood misconstrued and misinterpreted the provisions of the constitution in respect to the matters involved here cannot be sustained. As was said by the court in *Pratt v. Amalgamated Assn. of S. & E. Ry. Employes*, 50 Utah 472, 167 P. 830:

"* * * In any event the officers not only possessed the right but it was their duty to construe and apply the provisions of the constitution to the best of their understanding and ability. The fact that different officers have arrived at different conclusions regarding certain provisions of the constitution is but natural. What interpretation we might now place upon the constitutional provision in question is of no im-

portance, since we are not authorized to review the rulings of the regularly constituted officers of the association relating to the internal affairs of the association.''

By this suit, the plaintiffs are in effect appealing to this court from the decision of the board of appeals in respect to a matter over which the Brotherhood has exclusive control. This case, therefore, comes within the well established rule that, when the constitution and by-laws of an unincorporated, voluntary association, such as the Brotherhood, are reasonable and valid and provide a mode for determining when relief shall be given or denied to its own members by tribunals provided for therein, redress therefor may not be sought in the courts. See *Ryan v. New York Cent. R. Co.*, 267 Mich. 202, 255 N. W. 365, and authorities there cited.

The decree of the lower court is, therefore, reversed and the cause will be remanded to the court below with directions to dismiss the suit, without costs to either party in this or the court below.