Argued September 11, affirmed October 9, petition for rehearing
denied November 5, 1963

## McCLENDON v. KENIN ET AL
### 385 P. 2d 615

*Reuben Lenske,* Portland, argued the cause and filed a brief for appellant.

*Donald S. Richardson,* Portland, argued the cause for respondents. On the brief were Green, Richardson, Green & Griswold, Portland.

Before McALLISTER, Chief Justice, and O'CONNELL, GOODWIN, DENECKE and LUSK, Justices.

DENECKE, J.

The plaintiff filed a complaint alleging that the defendant labor organizations wrongfully refused to reinstate him as a member and prayed for damages and an injunction.

A bylaw of the defendant labor organization provides that a member shall be suspended from membership if such member owes a debt to another and fails to pay such debt or make satisfactory arrangements to pay it. Plaintiff alleged he had owed wages to other union members which he had not paid, but that plaintiff had been relieved from such debts by a discharge in bankruptcy. Defendants' demurrer was sustained.

We understand plaintiff to contend that the bankruptcy discharged plaintiff's debts to his fellow union members; therefore, the union could take no action to attempt to coerce payment of these former wage claims. This contention is not meritorious.

■ A discharge in bankruptcy is not payment of a debt.

> "The effect of a discharge upon a claim that is dischargeable is to afford a valid defense to the prosecution of the claim to judgment, or the satisfaction of the judgment if the claim has gone to judgment. The discharge is not a payment or extinguishment of the debt; it is simply a bar to all future legal proceedings for the enforcement of the discharged debt." 1 Collier, Bankruptcy (14th ed 1962), 1693, § 17.27. See, also, 8 Remington, Bankruptcy (6th ed 1955), 45, § 3225.

It has been held that a discharge in bankruptcy of a debt for overdue rent does not prevent the landlord from maintaining a summary proceeding for eviction because of nonpayment of such rent. *Carter v. Sutton,* 147 Ga 496, 94 SE 760 (1917).

The modern facet of the problem has involved state financial responsibility laws. These laws are directed at drivers who have unpaid judgments against them by reason of automobile accidents. Such statutes generally provide that the driver's license of a judgment debtor shall be suspended while the judgment is unpaid or suspended for a certain period.

In *Reitz v. Mealey,* 34 F Supp 532 (ND NY 1940), a three-judge district court upheld the validity of this part of the New York Financial Responsibility Law. Judge Learned Hand, in the majority opinion, wrote:

> "* * * Therefore, if § 17 [of the Bankruptcy

Act] must be read as relieving bankrupts of all sanctions for the collection of dischargeable debts, no matter what other public purpose they may serve, the section is invalid, for the Bankruptcy Act is paramount. We do not think that the section so much impedes the states in their policy. Inability to pay one's debts is not irrelevant in determining one's fitness for many kinds of activity." 34 F Supp, supra, at 534, aff'd 314 US 33, 62 S Ct 24, 86 L ed 21 (1941).

The New York statute involved in *Reitz v. Mealey,* supra, provided that if the judgment was not paid the license could be suspended for three years. A similar law in Utah provided that the license would be permanently cancelled. It also stated that the suspension or cancellation would only be at the judgment creditor's request and that the suspension could be lifted at the creditor's request. In *Kesler v. Dept. of Public Safety,* 369 US 153, 82 S Ct 807, 7 L ed2d 641 (1962), a majority of the court held the Utah act valid.

*Kesler* upheld the Utah law as an exercise of state police power. We have here, instead of an exercise of state police power, an exercise of the right of private persons to contract and associate. Union by-laws are usually considered to be a contract between the members and the labor organization. *Crocker v. Weil,* 227 Or 260, 281, 285, 361 P2d 1014 (1961). The freedom to contract and associate is also a constitutionaly derived power. *National Ass'n. for A. of C. P. v. Alabama,* 357 US 449, 78 S Ct 1163, 2 L ed2d 1488 (1958). Without attempting to compare the extent of these two constitutional powers, it would seem that if state financial responsibility laws do not "intrude[d] into the bankruptcy domain or subvert[ed] the purpose of bankruptcy law" (*Kesler,* supra, 82 S Ct at 819), then a private contract of association suspend-

ing membership for nonpayment of debts to fellow members would not so intrude or subvert. We so hold.

Plaintiff alleged that the bylaw in controversy is contrary to public policy.

■ We hold that a labor organization's bylaw providing that a member shall be suspended for nonpayment of a debt to a fellow member is not void as contrary to public policy. The law in this state and most others is as stated in *Allen v. Southern Pac. Co.,* 166 Or 290, 294, 110 P2d 933 (1941): "All persons, upon becoming members of such an organization [labor organization], are deemed to have agreed to be bound by its laws and general rules except where they involve a surrender of a personal or constitutional right or contravene the public law or public policy."

This being heard on demurrer, we accept plaintiff's allegation that defendant labor organizations have a virtual monopoly over musicians and without membership therein work is almost impossible. This fact may cause courts to scrutinize more closely the qualifications for admission and retention of membership, but it does not lead to the conclusion that all restrictions on membership are contrary to public policy.

■■ Procuring the payment of debts to members, particularly debts for wages, is a most legitimate objective of a labor organization. The state of Oregon has singled out debts for wages for special legislation. These laws provide for penalties, attorney fees and collection of unpaid wages by the state. ORS 652.110 et seq. There is no reason why a labor organization should not also single out this problem and attempt to solve it by means peculiarly available to a union.

There appear to be no judicial decisions passing upon a union regulation like the one here. Ornati,

*Union Discipline, Minority Rights and Public Policy,*
5 Labor L J, 471, 477 (1954), contains some pertinent
statements about the specific and general problem:

> "The cases studied reveal that there are no basic
> differences between union mores and those of
> society. There are rather differences in the degree
> with which unions and society look upon certain
> modes of conduct which are disapproved of both
> by the union and by our society. For example,
> while a man who fails to repay a debt to his neigh-
> bor is frowned upon by society, and mechanisms
> for redress exist which may or may not be used,
> the union, in an expression of group solidarity,
> often insists that the debt to a brother be repaid
> and uses the union discipline machinery to obtain
> compliance. * * *

> "* * * The union's broader morality cannot be
> regarded as contradictory to the mores of the
> society and does not justify public intervention [by
> courts or legislatures]."

The judgment is affirmed.