515 P.2d 431 (1973)
JOSEPHINE COUNTY SCHOOL DISTRICT NO. 7 ET AL., Respondents,
v.
OREGON SCHOOL ACTIVITIES ASSOCIATION, an Unincorporated Association, Appellant.
Court of Appeals of Oregon.
Argued and Submitted July 26, 1973.
Decided October 31, 1973.
*432 John R. Faust, Jr., Portland, argued the cause for appellant. With him on the briefs were Cake, Hardy, Buttler, McEwen & Weiss, Portland.
*433 Carl R. Neil, Portland, argued the cause for respondents. With him on the brief were Lindsay, Nahstoll, Hart, Duncan, Dafoe & Krause, Portland; Louis F. Schultz, Jr., Schultz, Salisbury & Cauble, Gene L. Brown, and Brown & Hughes, Grants Pass.
Before SCHWAB, C.J., and FOLEY and FORT, JJ.
FORT, Judge.
The Medford and Grants Pass High Schools are both members of the Southern Oregon League of the defendant, Oregon School Activities Association [OSAA]. On October 20, 1972, the varsity football teams of the two schools played each other. The Grants Pass team won the game. Because of the previous season records of each team, the latter became the Southern League champion, rather than the former, and, as such, became the league entry in the playoffs for the state high school football championship.
On October 24, 1972, Medford High School, the defeated team, filed a protest with the defendant claiming that one of the Grants Pass players was ineligible under defendant's bylaws governing eligibility.
On November 2, 1972, the Board of Control of defendant OSAA conducted a hearing on the protest and upheld it. Accordingly, it forfeited all of the league games in which the boy had participated as a member of the Grants Pass team during the season. As a result, Medford High School was declared the league champion.
After a request for reconsideration had been denied on November 7, 1972, plaintiff school district, together with Peters and two teammates, filed this declaratory judgment action seeking a determination that Grants Pass was the league champion and was entitled to represent it in the state playoffs.
Because the first playoff game was scheduled for that weekend, the parties agreed that the court could consider that a general denial had been filed by defendant, although none was ever filed.
The court heard testimony on November 9, 1972, and found as a fact that Jack Peters was eligible to play football for the Grants Pass football team. This ruling was made orally from the bench at the conclusion of an evening session. The quarter-final football game was to be played within 24 hours thereafter. Because of the obvious impossibility of an appeal, the parties considered themselves bound by the judgment but did not waive rights to appellate review.
Thus, Grants Pass High School in effect was restored by the trial court as the league champion and, accordingly, represented the Southern Oregon League in the state playoff game that weekend. The team was defeated in the first game of the playoff; thus, no further challenge to the court's ruling by other playoff school districts, none of whom were parties to this proceeding, is before us. A number of contentions are made, but we consider only those we conclude are necessary to a disposition of the case.
Plaintiff school district first contends that the matter is now moot since the Grants Pass-Medford game was played approximately a month before the court's judgment was entered and 24 hours after the court's finding of fact concerning the eligibility of Jack Peters to play for the Grants Pass team. We note from the briefs that defendant still retains the share of the playoff game proceeds payable under its rules to the Southern Oregon League champion. Thus, there is not only the right to the usual bric-a-brac of trophies and individual awards emblematic of a championship season but also the right to receive the undistributed funds retained by defendant.[1] In Robinson v. Illinois High School Association, 45 Ill. App.2d 277, 195 N.E.2d 38 (1963), cert. denied 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965), *434 the Court considered a similar contention. It stated:
"It has been suggested that the question presented for determination by this record is now moot and that the appeal should be dismissed. Auburn Senior High School may have won games which it would not have won had it not used an ineligible player, and for this, and other considerations, we concluded that the merits of this controversy should be determined." 195 N.E.2d at 43.
See also: Oklahoma High School Athletic Association v. Bray, 321 F.2d 269 (10th Cir.1963).
We agree and conclude this appeal is not moot.
A principal contention is that since the OSAA is a voluntary, unincorporated association of public and private schools having its own constitution, bylaws and officials, findings of fact regularly made by it pursuant thereto and relating to matters governed thereby are not subject to de novo review in an independent declaratory judgment brought by a member against the association. The trial court, doubtless due to the extreme shortness of time and the absence of pleadings by defendant, expressly refused to consider "legal questions," stating:
"Well, I'll tell you gentlemen, I would be doing you a disservice to attempt to decide this on legal questions. And accordingly, my decision is going to be based on a question of fact. * * *"
Defendant contends the court erred in re-trying de novo its finding of fact that Jack Peters had not established residence in Grants Pass as defined in its constitution and bylaws. We agree.
Article V, § 3 of Oregon School Activities Association Bylaws provides:
"The Board of Control shall hear and decide all protests and questions that may be brought to its attention, and in all cases the decisions of the Board of Control shall be final." (Emphasis supplied.)
The parties concede OSAA is a voluntary association. The rule is well established that courts should not re-try the proceedings of such organizations on the facts.
In Allen v. Southern Pac. Co., 166 Or. 290, 110 P.2d 933 (1941), the Supreme Court considered the nature of the relationship between members of a voluntary, unincorporated association, there the Brotherhood of Railroad Trainmen. A suit for a declaratory decree brought by one group of employes of the Southern Pacific Company against another group of employes sought, in effect, a reversal of a Brotherhood ruling concerning important working rights. All employes of both groups were members of the Brotherhood. After pointing out that the relationship between members of a voluntary, unincorporated association were contractual, the court said:
"* * * Its constitution and general rules are binding upon the Brotherhood and likewise upon all its members, all of whom are chargeable with knowledge of the laws and general rules of the organization. All persons, upon becoming members of such an organization, are deemed to have agreed to be bound by its laws and general rules except where they involve a surrender of a personal or constitutional right or contravene the public law or public policy." 166 Or. at 294, 110 P.2d at 935.
The court concluded:
"By this suit, the plaintiffs are in effect appealing to this court from the decision of the board of appeals in respect to a matter over which the Brotherhood has exclusive control. This case, therefore, comes within the well established rule that, when the constitution and bylaws of an unincorporated, voluntary association, such as the Brotherhood, are reasonable and valid and provide a mode for determining when relief shall be given or denied to its own members by tribunals provided for therein, redress *435 therefor may not be sought in the courts. [Citations omitted.]" 166 Or. at 306, 110 P.2d at 939.
More recently in McClendon v. Kenin, 235 Or. 588, 385 P.2d 615 (1963), the court expressly reiterated the contractual nature of the relationship between both members inter sese of a voluntary unincorporated association and between a member and the association.[2]See also: 6 Am.Jur.2d 466-67, Associations and Clubs § 37.
This rule has been applied to organizations identical in purpose to defendant. In Sturrup v. Mahan, Ind. App., 290 N.E.2d 64 (1972), the court said:
"The IHSAA [Indiana High School Athletic Association] is a voluntary association open to all public, private, parochial and institutional high schools of the State of Indiana. The authorities are legionary that courts will not interfere with the internal affairs of such voluntary associations absent mistake, fraud, collusion, arbitrariness or invasion of personal or property rights. [Citations omitted.]" 290 N.E.2d at 66.
The rule has elsewhere been applied to school activity associations similar to respondent. Robinson v. Illinois High School Association, supra; State ex rel. v. Oakley, Judge, et al., 152 W. Va. 533, 164 S.E.2d 775 (1968).
It is clear, therefore, that the trial court erred in undertaking a de novo review of the facts.
Plaintiff school district next asserts that the OSAA should not, under its rules, have considered the Medford High School protest at all, because it was not filed within ten days after the violation, as Article V, § 1 of the OSAA Bylaws requires.
Plaintiffs note, in their brief, that the Medford football coach had asked the Grants Pass coach to check on Jack Peters' eligibility prior to the beginning of the season. When his name appeared on the list of eligible players prior to the start of the season, plaintiffs contend Medford should have reported the alleged violation to OSAA within ten days.
We do not decide this procedural question because, even assuming Medford forfeited its right to protest Jack Peters' eligibility, OSAA bylaws, Article V, § 1 also provides:
"* * * However, the Board of Control may make rulings in cases of violations which have not been officially protested."
Since the relative standings of other schools were necessarily affected by a possible decision to declare that Grants Pass forfeit all games in which Jack Peters had played, we conclude the OSAA did not act arbitrarily in hearing the protest.
The next contention is that the OSAA rule[3] embodied in Article X, § 6, constitutes a violation of Jack Peters' right to travel, and thus contravenes the equal protection *436 clause of the U.S.Const. Amend. XIV.
In Haas v. South Bend Community School Corporation, Ind., 289 N.E.2d 495 (1972), the Indiana Supreme Court considered the question:
"Do the acts of the defendant-appellees in administering a program of interscholastic athletics for Indiana high schools constitute `state action' within the meaning of the Fourteenth Amendment to the Federal Constitution?" 289 N.E.2d at 496.
It stated:
"* * * [W]e conclude, therefore, that the administration of interscholastic athletics by the IHSAA [Indiana High School Athletic Association] should be considered to be `state action' within the meaning of the Fourteenth Amendment. [Citations omitted.]" 289 N.E.2d at 498.
In Louisiana High School Ath. Ass'n v. St. Augustine High School, 396 F.2d 224 (5th Cir.1968), the court considered the same question, and stated:
"There can be no substantial doubt that conduct of the affairs of LHSAA [Louisiana High School Athletic Association] is state action in the constitutional sense. * * *" 396 F.2d at 227.
We agree and conclude that the administration of high school athletics by the Oregon School Activities Association[4] constitutes state action within the meaning of the Fourteenth Amendment.
*437 Thus we turn to the boy's constitutional contentions. He contends that the right to travel[5] intrastate is a right protected from discriminatory regulation to the same extent as is his right to freedom of interstate movement. We agree.
In Sturrup v. Mahan, supra, the Indiana Court said:
"We have hereinabove stated that each citizen, adult or minor has a fundamental right to move freely from State to State and from City to City within the State. * * *" 290 N.E.2d at 68.
Thus it follows that Peters is entitled to the protections afforded by the Equal Protection Clause of the Fourteenth Amendment.
Article X, § 6b of the OSAA Bylaws provides, in part:
"* * * A student who transfers from any high school in the United States to any member high school becomes ineligible until one (1) calendar year after he first attends the new school. * * *
"A student does not lose eligibility where he moves with a parent, * * * from within to outside the district or attendance area (as established by the district school board) of his previous school, or from outside to within the district or attendance area of his new school. * * *
"* * * For purpose of this Section, the student and his parent or guardian `move' when they establish a joint residence for all purposes, with the intent to reside there indefinitely, and terminate all occupancy of their previous residence."
He contends that the classifications set up therein are discriminatory and therefore that the rule is void as applied to him. It is elementary that reasonable classifications are not barred by the Equal Protection Clause. Recently the Supreme Court stated in Schilb v. Kuebel, 404 U.S. 357, 364-365, 92 S.Ct. 479, 484, 30 L.Ed.2d 502 (1971):
"The Court more than once has said that state legislative reform by way of classification is not to be invalidated merely because the legislature moves one step at a time. `The prohibition of the *438 Equal Protection Clause goes no further than the invidious discrimination.' * * * But the Court also has refined this traditional test and has said that a statutory classification based upon suspect criteria or affecting `fundamental rights' will encounter equal protection difficulties unless justified by a `compelling governmental interest.' Shapiro v. Thompson, 394 U.S. 618, 634, 638, 89 S.Ct. 1322, 1331, 1333, 22 L.Ed.2d 600 (1969) * * *."
It remains, therefore, to consider whether the challenged bylaw promotes a compelling state interest.
In Shapiro v. Thompson, 394 U.S. 618, 638, 89 S.Ct. 1322, 1333, 22 L.Ed.2d 600 (1969), the court said:
"We conclude therefore that appellants in these cases do not use and have no need to use the one-year requirement for the governmental purposes suggested. Thus, even under traditional equal protection tests a classification of welfare applicants according to whether they have lived in the State for one year would seem irrational and unconstitutional. But, of course, the traditional criteria do not apply in these cases. Since the classification here touches on the fundamental right of interstate movement, its constitutionality must be judged by the stricter standard of whether it promotes a compelling state interest. Under this standard, the waiting-period requirement clearly violates the Equal Protection Clause."
The OSAA Bylaws, Article X, in its preamble states that the eligibility rules are adopted to prevent "not only actual proselyting, professionalism and participation by other than regular students in good standing, but conduct or circumstances which may give rise to the appearance thereof. Exceptions to the general rules herein will be narrowly construed to serve that purpose."
In Sturrup v. Mahan, supra, the court pointed out:
"The record before us indicates that the one-year residency requirement of the IHSAA is intended to serve two goals. One goal is to prevent the recruiting of student-athletes from one high school by other high schools. The second goal is to prevent school-jumping, that is, changing from school to school because of athletic rather than academic reasons.
"Schools are for education. There is no doubt that extracurricular athletic competition may add to the educational process, but the extracurricular activities should not take precedence over the curricular activities of the school. The sideshow may not consume the circus. The prevention of recruiting and school-jumping are both fitting and proper goals by which the IHSAA maintains the amateur standing of high school athletics. This we deem to be a compelling State interest." 290 N.E.2d at 67-68.
We agree.
The Board of Control of defendant at the conclusion of its hearing on Peters' eligibility concluded:
"In view of the evidence, none of which is dependent on the hearsay opinions and comments of students interviewed at Medford High and which should be disregarded as immaterial, it is evident that although Grants Pass school officials have not recruited or proselyted this student and probably assumed that he was eligible, they have been negligent in assuring themselves of the eligibility of Jack Peters, whose participation in athletics at Grants Pass High School is in violation of the spirit and intent of the residence requirements adopted by the representative of the schools in Oregon for participation in athletics and that the Medford protest be upheld."
At the conclusion of the rehearing, the Board of Control found:
"It was and is the opinion of this Board that its decision was supported not only by a violation of the spirit and intent of the rules, but failure of the student to meet the letter of the rules. If there is any doubt on this point, the *439 Board herewith states that it found the student to come within the rule of ineligibility set forth in Section 6b, that it found the student not to come within any exception to that rule, and, specifically, it found that there was no `move' as defined by Section 6b2."
Section 6b2 of Article X[6] of the Bylaws provides:
"* * * For purpose of this Section, the student and his parent or guardian `move' when they establish a joint residence for all purposes, with the intent to reside there indefinitely, and terminate all occupancy of their previous residence."
Article VI, § 2 of defendant's Bylaws provides:
"The penalty for the participation of an ineligible student shall be the forfeiture of the event participated in by the school involved and the disqualification of the participant for the remainder of that season. * * *"
It is uncontradicted that the sole reason Peters sought to establish his residence in plaintiff's district was to play football for Grants Pass High School. The Board of Control found that Peters' effort to change his residence from the Medford School District to Grants Pass School District violated 6b2 of Article X.
We conclude that the classification made in the challenged rule, considered in the light of its declared purpose and related provisions, was not "overbroad"[7] and was reasonably related to a compelling state interest  that of preventing school-jumping, as here, or recruiting primarily for athletic purposes.
The decree is reversed with instructions to dismiss the complaint.
Reversed.
SCHWAB, Chief Judge (specially concurring).
I concur in the result of the majority opinion which I understand to hold:
(1) The factual determinations of a voluntary association whose activities do not constitute state action are not subject to judicial review for any reason except perhaps for fraud or bad faith;
(2) The factual determinations of a voluntary association whose activities do constitute state action are not subject to judicial review absent statutory authorization, except perhaps for fraud or bad faith;
(3) Violations of its own procedural rules by a voluntary association are subject to judicial review whether or not its activities constitute state action;
(4) Claims that a voluntary association has deprived a person of procedural due process are subject to judicial review only if the activities of the association are found to be state action within the Fourteenth Amendment; and
(5) Claims that the rules of a voluntary association are invalid on substantive constitutional grounds are subject to judicial review only if the activities of the association are found to be state action within the Fourteenth Amendment.
FOLEY, J., joins in this specially concurring opinion.
NOTES
[1] We note that although Medford High School filed the protest with defendant, the plaintiffs did not see fit to join the Medford School District as a party in this proceeding.
[2] McClendon involved a dispute between two members of the Musicians Union. The Court said:

"This being heard on demurrer, we accept plaintiff's allegation that defendant labor organizations have a virtual monopoly over musicians and without membership therein work is almost impossible. This fact may cause courts to scrutinize more closely the qualifications for admission and retention of membership, but it does not lead to the conclusion that all restrictions on membership are contrary to public policy." 235 Or. at 592, 385 P.2d at 617.
[3] OSAA Bylaws, Art. X, § 6:

"a. Before a student can participate in athletics after having transferred from one high school to another high school, a transfer certificate in form prescribed by the OSAA, properly signed by the superintendent or principal of the high school he enters and accompanied by a transcript of credits from his former high school, must be filed with the OSAA office (Transfer Certificate).
"b. A student who transfers from any high school in the United States to any member high school becomes ineligible until one (1) calendar year after he first attends the new school. For purposes of this rule, a student is deemed to have transferred from another high school if at any previous time he registered and attended classes at, or participated in any way in athletics at, another high school.
"1. A student does not lose eligibility where he registered or attended the previous high school under a bona fide error as to the boundary of its district or attendance area, provided that he has not participated in any way in athletics at the previous high school.
"2. A student does not lose eligibility where he moves with a parent, or with a person who prior to their move was his legal guardian and lived with him, either from outside to within this state, or from within to outside the district or attendance area (as established by the district school board) of his previous school, or from outside to within the district or attendance area of his new school. For purposes of this Section, a `district' is any public high school district (including unified or similar districts) established under Oregon law, and the `district' and `attendance area' of a private school is the district in which it is located, or if it is not located in a district as defined herein, any Oregon public school district (including nonhigh school districts) in which it is located. For purpose of this Section, the student and his parent or guardian `move' when they establish a joint residence for all purposes and with the intent to reside there indefinitely, and terminate all occupancy of their previous residence.
"3. A student does not lose eligibility where he transfers between school years from a school outside his home area to a school within his home area. His `home area' is the attendance area, or if none, the district, in which he and a parent or guardian resided both at the time of the transfer and at the time of first enrollment in the previous school.
"4. A student does not lose eligibility where he transfers to or from a boarding school if in the school year in which he transfers he did not participate on any high school team with an interscholastic competitive schedule or if the principal of the previous school signs and files with the Executive Secretary of the OSAA a paper releasing the student for athletic activity at the new high school."
[4] Relevant provisions from the Constitution and Bylaws, as revised January 1, 1972, include the following:

Article II, § 1, OSAA Constitution:
"The object of this organization shall be to protect the interests of high, junior high, and elementary schools belonging to the Association, and to regulate interscholastic activities, such as meets, contests, or tournaments that embrace schools of the state of Oregon, or sections thereof, and to provide and operate a Mutual Benefit Program for the benefit of the pupils of high, junior high, and elementary schools."
Article I, § 3, OSAA Bylaws:
"Member schools shall secure the most competent officials available to officiate in all festivals, meets, contests or tournaments. For football, basketball, wrestling and baseball contests, member schools are required to use certified officials who are in good standing with the Oregon School Activities Association."
Article VII, § 1, OSAA Bylaws:
"A member school that engages in a festival, meet, contest or tournament with a non-member school, or with a school that has been suspended or expelled, shall itself be suspended for a period of one (1) year from date of offense."
Article X, OSAA Bylaws:
"The purpose of this Article is to preserve harmony among member schools and districts by preventing not only actual proselyting, professionalism and participation by other than regular students in good standing, but conduct or circumstances which may give rise to the appearance thereof. Exceptions to the general rules herein will be narrowly construed to serve that purpose."
It is obvious that the OSAA has direct control of the operation of many essential, authorized, major segments of public school activities.
[5] Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Cox, Travel: The Evolution of a Penumbral Right, 5 St. Mary's L.J. 84, 99 (1973).

The constitutional source of the right to travel is not agreed upon. Shapiro v. Thompson, supra, 394 U.S. at 630, and dissent of Warren, C.J., at 644, 89 S.Ct. 1322. See also: Residence Requirements After Shapiro v. Thompson, 70 Colum.L.Rev. 134 (1970).
Although many cases have involved the right only in the context of interstate travel and have sometimes based the right upon the interstate commerce clause, other cases have not so limited the right. See Shapiro v. Thompson, supra, 394 U.S. at 630, n. 8, 89 S.Ct. 1322, for a list of the various cases.
In Kent v. Dulles, 357 U.S. 116, 125-127, 78 S.Ct. 1113, 1118, 2 L.Ed.2d 1204 (1947), the court, in discussing the right to travel, stated, inter alia:
"* * * In Anglo-Saxon law that right was emerging at least as early as the Magna Carta. Chafee, Three Human Rights in the Constitution of 1787 (1956), 171-181, 187 et seq., shows how deeply engrained in our history this freedom of movement is. Freedom of movement across frontiers in either direction, and inside frontiers as well, was a part of our heritage. Travel abroad, like travel within the country, may be necessary for a livelihood. It may be as close to the heart of the individual as the choice of what he eats, or wears, or reads. Freedom of movement is basic in our scheme of values. See Crandall v. State of Nevada, 6 Wall. 35, 44, 18 L.Ed. 744; Williams v. Fears, 179 U.S. 270, 274, 21 S.Ct. 128, 129, 45 L.Ed. 186; Edwards v. People of State of California, 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed. 119. `Our nation,' wrote Chafee, `has thrived on the principle that, outside areas of plainly harmful conduct, every American is left to shape his own life as he thinks best, do what he pleases, go where he pleases.' Id. at 197."
This historical analysis would seem as applicable to intrastate as it is to interstate and foreign travel.
[6] We note Article X, § 8, provides for waiver or modification of any eligibility rule where there are "circumstances beyond the control of the student whereby enforcement of the rule would work an undue hardship on the student" and establishes procedures to invoke it. No claim was made by or on behalf of Peters thereunder.
[7] In Sturrup v. Mahan, Ind. App., 290 N.E.2d 64 (1972), the Indiana court found as "overbroad," and hence in violation of the Equal Protection Clause, a rule which denied athletic eligibility for one year to a student who moved from Florida to Indiana "because of the demoralizing and detrimental conditions of his home and school environment." The boy was living with an older brother who was his legal guardian. The rule denied eligibility to any student "who transfers to a new school without a corresponding change in his parent's residence." The court concluded the rule was overbroad because:

"* * * All students are covered by a blanket classification which has no relationship to whether a particular student's reasons for changing schools are athletic. * * *" 290 N.E.2d at 69.
Here it is conceded that Peters' sole reason for "moving" was to play football at Grants Pass.